IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA WAKAMATSU,<br><br>    Plaintiff,<br><br>    v.<br><br>ROBERT W. OLIVER, D.D.S. & DAVID M. PERRY, D.D.S., INC. et al.,<br><br>    Defendants.<br>_____/ | No. C 11-00482 CRB<br><br>**ORDER RE MOTIONS FOR SUMMARY JUDGMENT** |

    Before the Court are Defendants Dr. David M. Perry, D.D.S.'s ("Dr. Perry's") and Dr. Perry and Robert W. Oliver, D.D.S. and David M. Perry, D.D.S., Inc.'s ("the Company's") Motion for Summary Judgment (dkt. 31) and Plaintiff Sandra Wakamatsu's ("Plaintiff's") Motion for Judgment (dkt. 47). Dr. Perry administrated the Robert W. Oliver, D.D.S. and David M. Perry, D.D.S., Inc. 401(k) Profit Sharing Plan ("Plan" or "the Plan") on behalf of the Company. In December 2008, Plaintiff requested her benefits be distributed to her based on an account valuation date of December 31, 2007. However, because the Plan's value dropped dramatically over the course of 2008, Dr. Perry instead offered to pay Plaintiff based on a valuation date of December 31, 2008. Plaintiff seeks to recover the difference between what she eventually received and her expected payout based on the December 31, 2007, valuation. Because Dr. Perry acted within his discretion, in the best interest of the Plan

participants, and in accordance with the usual practice, the Court DENIES Plaintiff's Motion for Judgment and GRANTS Defendants' Motion for Summary Judgment.

## I. BACKGROUND

Defendant Dr. Perry is a shareholder of the Company, which is the sponsor and administrator of the Plan. Perry Decl. (dkt. 32) ¶ 1. Dr. Perry executes duties as Plan Administrator on behalf of the Company. Id. ¶ 1. Dr. Perry contracted with Associates in Excellence ("AIE") to provide administrative record keeping for the Plan. Id. ¶ 8.

The Plan grants the Plan Administrator broad discretion to interpret the Plan and determine the participants' benefits under the Plan:

> The Plan Administrator will administer the Plan for the exclusive benefit of the Plan Participants and Beneficiaries, and in accordance with the terms of the Plan. To the extent the terms of the Plan are unclear, the Plan Administrator may interpret the Plan, provided such interpretation is consistent with the rules of ERISA and Code §401 and is performed in a uniform and nondiscriminatory manner. This right to interpret the Plan is an express grant of discretionary authority to resolve ambiguities in the Plan document and to make discretionary decisions regarding the interpretation of the Plan's terms, including who is eligible to participate under the Plan and the benefit rights of a Participant or Beneficiary. The Plan Administrator will not be held liable for any interpretation of the Plan terms or decision regarding the application of a Plan provision provided such interpretation or decision is not arbitrary or capricious.

The Pension League Defined Contribution Prototype Plan and Trust, Basic Plan Document #01 (dkt. 32 Ex. B) ("Prototype Plan") at 68.[1] The Plan also grants discretion to "review and decide on claims for benefits under the Plan." Id. at 69.

The value of an individual participant's account "consists of the fair market value of the Participant's share of the Trust assets." Id. at 78. Participants' retirement benefits were kept in a pooled investment account ("Pooled Account"), separate from Dr. Perry's own investments. Perry Decl. ¶¶ 8, 10. Valuation of the assets must be conducted at least annually, but the Plan Administrator may request interim valuations. Prototype Plan at 78. Plan assets are distributed based on the valuation date that "immediately precedes the date the Participant receives his/her distribution from the plan." Id. at 49. Distribution of an

---

[1] The Prototype Plan is incorporated as part of the Plan. See Robert W. Oliver, D.D.S. & David M. Perry, D.D.S., Inc. Volume Submitter 401(k) Plan (dkt. 32 Ex. A) ("Agreement") at 1.

account exceeding $5,000 is first available "as soon as administratively feasible" following the employee's termination. Agreement at 18.

Plaintiff Sandra Wakamatsu worked for Dr. Perry's dental office, retiring on October 31, 2006. Wakamatsu Decl. (dkt. 36) ¶ 2. In a letter to Plaintiff dated December 10, 2008, Beth Bowles of AIE estimated Plaintiff's payable benefits at $195,317.82. Wakamatsu Decl. Ex. 1. AIE arrived at the estimate based on the valuation date of December 31, 2007 ("the 2007 Valuation"). See Wakamatsu Decl. Ex. 5. Plaintiff completed the required retirement plan forms on December 17, 2008. Wakamatsu Decl. ¶¶ 14-15. AIE informed Dr. Perry that the paperwork had been received, and told Dr. Perry that he "may now proceed with the distribution" based on the 2007 Valuation. Wakamatsu Decl. Ex. 4. The letter indicated that Plaintiff's account would be subject to gains or losses attributable to 2008 if she did not receive her distribution by December 31, 2008. Id.

After determining that processing Plaintiff's claim under the 2007 Valuation would be a breach of fiduciary duty owed to the remaining Plan participants, Dr. Perry processed Plaintiff's request for benefits under a valuation date of December 31, 2008 ("the 2008 Valuation"). Perry Decl. ¶ 8 & Ex. F. Based on the 2008 Valuation, Plaintiff's account totaled $135,449.40. Perry Decl. Ex. F. Plaintiff declined to take payment in 2009. Wakamatsu Decl. ¶ 21.

The Plan was subject to another valuation on December 31, 2009 ("the 2009 Valuation"), which valued Plaintiff's benefits at $159,581.93. Id. ¶ 29. On June 17, 2010, Plaintiff filed an administrative claim for benefits based on the 2007 Valuation. Wakamatsu Decl. ¶ 36. The defendants denied Plaintiff's claim on July 23, 2010. Perry Decl. ¶ 12 & Ex. H. Plaintiff appealed on September 15, 2010, which was denied on November 15, 2010. Id. ¶¶ 13-14 & Exs. I, H. In the meantime, Plaintiff took distribution of $159,581.93 based on the 2009 Valuation, while reserving the right to seek the $35,735.89 difference between the distribution and the value based on the 2007 Valuation. Perry Decl. Ex. I.

Plaintiff filed the instant action to recover $35,735.89 on February 1, 2011. Compl. (dkt. 1). The parties have filed cross-motions for summary judgment.

3

## II.     LEGAL STANDARD

Summary judgment is properly entered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The movant bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). The movant is not required to produce evidence negating the non-movant's claims. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990) ("[T]he purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues"). If the movant carries its burden, the burden shifts to the nonmoving party to establish facts beyond the pleadings showing that a triable issue of disputed material fact remains so that summary judgment is not appropriate. Celotex, 477 U.S. at 324; Adickes, 398 U.S. at 157.

To successfully rebut a properly supported summary judgment motion, the non-moving party "must point to some facts in the record that demonstrate a genuine issue of material fact and, with all reasonable inferences made in the [nonmoving party's] favor, could convince a reasonable jury to find for [that party]." Reese v. Jefferson School Dist. No. 14J, 208 F.3d 736, 738 (9th Cir. 2000). The non-moving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The opposing party may not rest on conclusory allegations or mere assertions. Rather, it must present significant probative evidence of specific facts raising a material issue that "can be resolved only by a finder of fact because [the issue] may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 249-50, 256.

4

## III. DISCUSSION

Plaintiff alleges that Dr. Perry abused his discretion as Plan Administrator by applying the 2008 Valuation to her claim. Pl. Opp'n (dkt. 34) at 2-3. The parties agree that the Plan gave Dr. Perry, as Plan Administrator, discretion to "resolve ambiguities in the Plan document and to make discretionary decisions regarding the interpretation of the Plan's terms." Prototype Plan at 68; see Pl. Opp'n at 7. However, Plaintiff alleges that conflicts of interest influenced Dr. Perry's exercise of his discretion.

### A. Dr. Perry's Alleged Conflicts of Interest

Plaintiff raises four potential conflicts of interest that allegedly tainted Dr. Perry's decision: (1) that Dr. Perry's wife and two daughters had money in the pooled investment account; (2) that Dr. Perry's wife, Judy Perry, involved herself in the administration of benefits; (3) that Dr. Perry operated under a bias favoring current employees over retired employees; and (4) that Dr. Perry's potential personal liability improperly influenced his decision. Pl. Opp'n at 9-13.

In the absence of a conflict of interest, "the plan administrator's decision can be upheld if it is 'grounded on any reasonable basis.'" Montour v. Hartford Life & Accident Ins. Co., 582 F.3d 933, 940 (9th Cir. Cal. 2009) (quoting Sznewajs v. Bancorp Amended & Restated Supplemental Benefits Plan, 572 F.3d 727, 734-35 (9th Cir. 2009)). However, if the same entity both pays the benefits and evaluates the claims, there is a "structural conflict of interest" and a more complex analysis is required. Id. A court can give more or less weight to a conflict depending on what the other evidence shows. Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 868 (9th Cir. 2008). A court can "view the conflict with a low level of skepticism if there's no evidence of malice, of self-dealing, or of a parsimonious claims-granting history." Id. However, the court "may weigh the conflict more heavily if there's evidence that the administrator has given inconsistent reasons for denial, has failed adequately to investigate a claim or ask the plaintiff for necessary evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly." Id.

### 1. The Financial Interests of Dr. Perry's Family Members

Plaintiff's first claim is that Dr. Perry's wife and two children had money in the pooled investment account, affecting his decisions. Pl. Opp'n at 9. A conflict of interest exists when "an administrator has an incentive to pay as little in benefits as possible to plan participants because the less money the insurer pays out, the more money it retains in its own coffers." Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 966 (9th Cir. 2006), abrogated on other grounds, Metro. Life Ins. Co. v. Glenn, 554 U.S. 105 (2008). Here, while Dr. Perry's own funds are separately held, his wife and daughters held an interest in the pooled account totaling $85,750.75 under the 2008 Valuation. Perry Supp. Decl. (dkt. 45) ¶¶ 9-10. Thus, Dr. Perry did have a conflict of interest to avoid paying Plaintiff, because paying Plaintiff would reduce the Pooled Account value and thus reduce the value of his wife and daughters' interests.[2] Although a conflict exists, the Court must determine what weight to place on the conflict. See Glenn, 544 U.S. at 108, 115-17. Here, Dr. Perry's family members held an approximately 10% interest in the pooled account. Def. Reply (dkt. 44) at 7 n.5. Because Plaintiff is claiming that she was underpaid by $35,753.89, the 10% interest attributable to Dr. Perry's family members in that underpayment comes out to approximately $3,575. When viewed in relation to Dr. Perry's separate account worth over $3 million, the $3,575 does not warrant much weight when reviewing Dr. Perry's decision. Furthermore, Dr. Perry's interest in preserving the Pooled Account because his family members held a portion of it is subsumed by his fiduciary duty to all of the Plan's participants to avoid overpaying participants. Therefore, his family members' investments in the Pooled Account were unlikely to affect on his decision-making process, and the Court will not give them much weight.

### 2. Dr. Perry's Wife "Meddling" in the Plan

Plaintiff's second claim is that Dr. Perry's wife Judy "meddled" in the administration of the plan. Pl. Opp'n at 10. Dr. Perry's declaration states that Mrs. Perry acted as his agent

---

[2] The pooled account was valued at $883,462 as of December 31, 2008. Def. Reply at 7 n.5.

6

when assisting in administration of the Plan, but that Dr. Perry retained authority for making any final decisions. Perry Supp. Decl. ¶ 7. Plaintiff has not presented any facts to contradict Dr. Perry's declaration. Thus, there is no evidence to support this claim.

### 3. Current and Retired Employees

Plaintiff's third argument that a conflict of interest existed is that Dr. Perry favored current employees over retired employees when administrating the plan. Pl. Opp'n at 11-12. Plaintiff does not offer any authority suggesting that this is recognized as a conflict of interest. If Plaintiff's argument it accepted, then nearly every plan governed by ERISA would give rise to a conflict of interest when the plan covered both current and retired employees and the plan administrator makes a determination of benefits that is unfavorable to a retired employee. Given the lack of law to support this position or any evidence suggesting that such a conflict existed in fact, it is not compelling.

### 4. Liability to Other Participants

Plaintiff's final argument for finding a conflict of interest is that Dr. Perry acted to avoid liability for breaching his fiduciary duty to other participants, again without citing any supporting authority. Pl. Opp'n at 12. ERISA requires that fiduciaries discharge "duties with respect to a plan solely in the interest of the participants and beneficiaries," imposing a fiduciary duty to all plan participants. 29 U.S.C. § 1104(a)(1). If, as Plaintiff suggests, a fiduciary acts under a conflict of interest by acting in the interest of all plan participants and beneficiaries, then denying any claim made by any participant would create a conflict of interest. This would mean that a conflict of interest exists in every plan administered pursuant to ERISA's statutory mandate, a conclusion that would be illogical.

Although Dr. Perry acted under a conflict of interest because his wife and two daughters held an interest in the Pooled Account, when viewed in context, the conflict deserves minimal weight. Ultimately, the Court reviews Dr. Perry's decisions for abuse of discretion with additional skepticism proportional to the minor conflict.

//
//

7

### B.      Dr. Perry's Decision on the Merits

Dr. Perry denied paying Plaintiff's claim for benefits under the 2007 Valuation because he determined that it did not represent the account's true value, and paying benefits based on that valuation would have prejudiced the other participants. Def. Mot. at 5-6.

Dr. Perry's denial of payment under the 2007 Valuation is reviewed for abuse of discretion. A challenge to an ERISA plan's denial of benefits under 29 U.S.C. § 1132(a)(1)(B) is reviewed for abuse of discretion if the plan gives the administrator discretionary authority to construe the terms of the plan. Abatie, 458 F.3d at 963; see Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). "An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." Boyd v. Bell, 410 F.3d 1173, 1178 (9th Cir. 2005) (citing Bendixen v. Standard Ins. Co., 185 F.3d 939, 944 (9th Cir. 1999)). The administrator's decision will be upheld if "it is based upon a reasonable interpretation of the plan's terms and was made in good faith." Id. (quoting Estate of Shockley v. Alyeska Pipeline Serv. Co., 130 F.3d 403, 405 (9th Cir. 1997)).

#### 1.      Dr. Perry Reasonably Decided Not to Apply the 2007 Valuation

The first issue for the Court is whether Dr. Perry acted within his discretion when he decided that the 2007 Valuation did not accurately represent the value of the Pooled Account at the end of 2008. See Def. Mot. at 5-6.

When a past account valuation does not accurately reflect the present account value due to unusual economic circumstances, it is reasonable to conduct a special valuation before distributing proceeds to avoid prejudicing other plan participants. Jasper v. M.H & B.L. Jasper D.D.S., P.C. Profit Sharing Plan, 340 F. Supp. 2d 1017, 1027-28 (E.D. Mo. 2004). In Jasper, the plaintiff retired and sought distribution of his proceeds from a retirement plan governed by ERISA. Id. at 1020-21. The plan documents adopted an annual valuation date of March 31, but granted the administrator the power to designate a special valuation date when necessary to avoid prejudice to any participant. Id. at 1021-22. The plaintiff

terminated his employment on June 12, 2001, and submitted his benefit distribution forms on August 2, 2001. Id. at 1021. The plan required payment on the "first day of the calendar month that coincides with or next follows the date 60 days after the date the Participant . . . consent[s] to the distribution." Id. Based on a valuation date of March 31, 2001, the plan held assets of $2,405,041, and the plaintiff was entitled to $2,228,501, over 92% of the total value. Id. at 1020. However, due to the events of September 11, 2001, the total value of the plan on September 21, 2001, was estimated at approximately $2,100,000. Id. at 1022. The plan disbursed benefits to the plaintiff using a valuation date of October 1, 2001. Id. at 1023. The Eastern District of Missouri upheld the administrator's use of a special valuation date, because doing so avoided prejudice to all the other participants in the plan. Id. at 1027. By applying the special valuation date, the plan administrator ensured that all the participants "would suffer their pro rata share" of the effects of September 11. Id. at 1027-28. Finding that the administrator acted consistently with the goal of considering the assets of all the participants, given the crisis affecting the account's value, the court concluded that the administrator did not abuse its discretion by choosing a special valuation date. Id. at 1028.

Here, like in Jasper, Dr. Perry acted reasonably when he determined that, due to unforeseen market conditions, paying benefits to Plaintiff based on the 2007 Valuation would prejudice the other participants in the plan. The Plan provides for annual valuation, but allows the Administrator to perform interim valuations. Prototype Plan at 78. Given the drastic decrease in the value of the Pooled Account in 2008, the 2007 Valuation no longer reflected the actual value of the Pooled Account at the end of the year. Dr. Perry reasonably concluded that making a distribution based on the 2007 Valuation would have allowed Plaintiff to escape her share of the losses occurring in 2008 and force the other participants to bear those losses. It is important to recognize that applying a different valuation date did not deprive Plaintiff of her benefits, and instead merely ensured that Plaintiff bore her share of the losses that the Plan suffered over the course of the year. Dr. Perry acted reasonably and fulfilled his duties to all Plan participants by refusing to apply the 2007 Valuation to Plaintiff's claim for benefits. Courts have consistently upheld similar decisions to properly

9

allocate losses when plans governed by ERISA experienced drastic losses in anomalous market conditions. See, e.g., Wininger v. Wilcox Fuel, Inc., No. 02-1671, 2004 WL 97626, at *3 (D. Conn. Jan. 12, 2004) (upholding an interim valuation to avoid the inequitable result of giving the plaintiff "a lump-sum payout that did not reflect the true value of his formulaic share, and leaving the remaining participants in the Plan to shoulder all the losses from the stock market downturn"); Cator v. Herrgott & Wilson, Inc., 609 F. Supp. 12, 15 (N.D. Cal. 1984) (upholding an amendment allowing an interim valuation because "fluctuating market conditions, changing financial conditions, and economic circumstances could result in a 'windfall' to [the plaintiff] at the expense of the other twelve Plan participants if an interim valuation date was not enacted").

Plaintiff attempts to analogize this case to Brug v. Pension Plan, 669 F.2d 570 (9th Cir. 1982), where the Ninth Circuit held that rescission of an amendment could not be retroactively applied to divest the plaintiff of her benefits. 699 F.2d at 575. In Brug, the plan's trustees had adopted an amendment making clerical workers eligible for retirement benefits. Id. at 572. The amendment made the plaintiff eligible for benefits, but the administration committee deferred consideration of her application until after rescinding the amendment that made her eligible. Id. at 573. The district court upheld the administration committee's decision, but the Ninth Circuit reversed. Id. at 574. The plaintiff clearly met the requirements for the disability pension retirement benefits created by the amendment at the time she applied, and the administration committee's decision retroactively divested her of the benefits. Id. While the administration committee had discretion to rescind the amendment going forward, it abused its discretion by applying that rescission retroactively to the plaintiff's vested benefits. Id. at 575.

Unlike in Brug, Dr. Perry did not retroactively divest Plaintiff of her benefits. Rather than divest Plaintiff of her benefits, the application of an alternate valuation fairly distributed the losses that the Pooled Account suffered among all the participants, including Plaintiff. Plaintiff received the benefits she was entitled to, not the inflated amount she hoped to receive based on an out-dated valuation. Furthermore, here the Plan provided for interim

10

valuations during the entirety of Plaintiff's employment, unlike in Brug where the material change occurred after the plaintiff's retirement. Thus, Brug is not applicable to this case.[3]

Plaintiff has not demonstrated a triable issue of fact on the question of whether Dr. Perry abused his discretion by applying a valuation date other than December 31, 2007.

### 2. Dr. Perry Reasonably Applied the 2008 Valuation to Plaintiff's Request for Benefits

The next inquiry is whether Dr. Perry acted reasonably by using the upcoming 2008 Valuation rather than request an interim valuation to apply to Plaintiff's claim for benefits. Dr. Perry decided against conducting an interim valuation, "given the time and expense involved in conducting a Plan valuation and the proximity in time to the December 31, 2008 valuation." Perry Decl. (dkt. 32) ¶ 8. ERISA requires that an administrator discharge his duties in the interest of the participants and beneficiaries, for the purpose of providing benefits and "defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A)(ii); see McCabe v. Capital Mercury Apparel, 752 F. Supp. 2d. 396, 411 (S.D.N.Y. 2010) ("Incurring . . . expenses for a new valuation, only months before the regularly scheduled valuation was set to take place, would run counter to defendants' statutory duty to defray administrative expenses."). Given that Plaintiff's request for disbursement came a mere two weeks before the scheduled end-of-the-year valuation, Dr. Perry did not act unreasonably by waiting to apply that valuation to Plaintiff's claim. Conducting an interim valuation would have required additional expenditure, and the already-scheduled 2008 Valuation provided an accurate valuation of Plaintiff's account for disbursement.[4] See Prototype Plan at 69 (expenses in administering the Plan are paid from Plan assets).

Dr. Perry's decision did not contradict the Plan's language. An administrator abuses his discretion if he acts contrary to the documents and instruments governing the plan. See

---

[3] The court in Cator distinguished Brug on similar grounds. See Cator, 609 F. Supp. at 16.

[4] Because the 2008 Valuation would occur within two weeks of Plaintiff's request, it represented her account value more accurately than the 2007 Valuation did.

11

1 29 U.S.C. § 1104(a)(1)(D). The Plan provides that "a Participant's Account Balance is
2 determined as of the Valuation Date (as specified in Part 12 of the Agreement) which
3 immediately precedes the date the Participant <u>receives</u> his/her distribution from the Plan."
4 Prototype Plan at 49 (emphasis added). In arguing that Dr. Perry did not have discretion to
5 wait for the 2008 Valuation, Plaintiff persistently clings to Part 9 of the Agreement, which
6 provides that "[d]istribution is first available as soon as administratively feasible following:
7 the Participant's employment termination date." Agreement at 18. However, the "as soon as
8 administratively feasible" language that Plaintiff relies on only governs the timing of initial
9 availability of a distribution, not the timing of a distribution following a request. Because the
10 Plan is silent as to the timing of distribution after a request is made, Dr. Perry had discretion
11 as the Plan Administrator to determine when to make the distribution.[5] Dr. Perry did not
12 abuse that discretion by waiting until the 2008 Valuation accurately reflected the value of
13 Plaintiff's account.
14    Finally, Dr. Perry's decision to use the year-end valuation for Plaintiff's benefits
15 conformed with the usual practice when administering the Plan. Plan participants Sally and
16 Lillian both requested distribution of benefits on November 29, 2007. <u>See</u> Perry Supp. Decl.
17 ¶ 3; PER 00924, 00942. They each received an initial payment on April 9, 2008, and a
18 supplemental payment on December 22, 2008. <u>See</u> PER 00932, 00952, 00982, 00983. Both
19 Sally and Lillian made requests towards the end of 2007, and their initial estimates were
20 based on the valuation conducted on December 31, 2006. However, because their payments
21 were made in 2008, Dr. Perry used the 2007 Valuation to compute their total distribution,
22 with the payments in December 2008 representing the additional benefits that Sally and

---

[5] Plaintiff's argument that the letter from AIE dated December 22, 2008, required Dr. Perry to make payment immediately is unpersuasive. <u>See</u> Pl. Opp'n at 8. The letter clearly states that Dr. Perry "may" proceed with distribution, consistent with AIE's limited role as a record keeper. <u>See</u> Perry Decl. Ex. E. Furthermore, the letter itself contemplates the possibility that Plaintiff would not receive her distribution until 2009 in warning that her account balance could be subject to gains and losses attributable to 2008. <u>See id.</u> Finally, the letter is consistent with Dr. Perry's interpretation that the valuation date is prior to <u>distribution</u>, not prior to <u>request</u> as Plaintiff urges, because it warns Dr. Perry that Plaintiff's account would be subject to gains and losses if she did not <u>receive</u> distribution before the end of the year. <u>See id.</u>

Lillian were due under the increased valuation. See Perry Supp. Decl. ¶ 3; Wakamatsu 2d Decl. (dkt. 68) Ex. 1. Thus, both Sally and Lillian were paid benefits under the 2007 Valuation, the valuation preceding their receipt of benefits.

Here, Dr. Perry applied the same process to Plaintiff's claims, but the value of the Pooled Account decreased dramatically during 2008. Had the value increased, Plaintiff would have been first paid an initial estimate and then paid the residual that was not accounted for in the outdated valuation – just like Sally and Lillian were – and it is unlikely that Plaintiff would have complained. See Perry Supp. Decl. ¶ 5; Wininger, 2004 WL 97626, at *3 ("Had the interim valuation been done to determine and equitably increase Wininger's retirement payout due to an anomalous situation caused by a bull market, it is highly unlikely that there would have been any objection by Wininger or any of the Plan participants."). Given the drastic decrease in the value of the Pooled Account, Dr. Perry could not make a partial payment to Plaintiff, and instead acted reasonably by waiting for the upcoming valuation to be completed before disbursing Plaintiff's benefits.

Dr. Perry reasonably decided to use the upcoming 2008 Valuation to distribute Plaintiff's benefits because the 2008 Valuation more accurately represented the true value of her account. Therefore, Plaintiff fails to raise a triable issue of fact on the issue of whether Dr. Perry abused his discretion as Plan Administrator.

**IV. CONCLUSION**

For the foregoing reasons, the Court DENIES Plaintiff's Motion for Judgement and GRANTS Defendants' Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated: April 9, 2012

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE